**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | |
|---|---|
| **DAWN CARSWELL**, on behalf of herself, the Regions Financial Corporation Group Healthcare Plan, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**REGIONS FINANCIAL CORPORATION; REGIONS BANK; and JOHN DOES 1–20**,<br><br>Defendants. | Case No. ____________________<br><br>**CLASS ACTION COMPLAINT**<br><br>(ERISA, 29 U.S.C. § 1001 *et seq.*) |

Plaintiff, Dawn Carswell ("Plaintiff"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Regions Financial Corporation ("Regions Financial") and Regions Bank (together with Regions Financial, "Regions" or "Defendants") based upon personal knowledge with respect to Plaintiff and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters:

## NATURE OF THE ACTION

1. This lawsuit challenges Defendants' unlawful practice of charging a "Tobacco/Vape User" surcharge under the Regions Financial Corporation Group Healthcare Plan (the "Plan") in a manner that violates the Employee Retirement

Income Security Act of 1974 ("ERISA") and its implementing regulations. ERISA permits health-contingent wellness programs that promote health if, and ***only if***, such programs strictly comply with the criteria governing these programs, including: (i) offering a meaningful and accessible *reasonable* alternative standard to any individual being charged extra based on a health factor; (ii) clearly disclosing the availability of that alternative standard—along with a statement that the recommendations of a participant's personal physician will be accommodated—in "***all*** plan materials" describing the surcharge; (iii) making available the "full reward" to all participants who satisfy the reasonable alternative standard; and (iv) providing participants with the opportunity to qualify for the reward at least once per year. *See* 29 U.S.C. § 1182; 42 U.S.C. § 300gg-4(j); 29 C.F.R. § 2590.702(f). Defendants comply with none of these requirements.

2. Tobacco surcharges have become more prevalent in recent years but, to be lawful, plans must make available a compliant "wellness program" that provides employees with an avenue to avoid the surcharge. Making a compliant wellness program available means employers ***must*** adhere to strict rules set forth by ERISA and the implementing regulations established by the Departments of Labor, Health and Human Services, and the Treasury (collectively, the "Departments") more than ten years ago, in 2014. ERISA imbues the Departments with the authority to promulgate regulations interpreting ERISA § 702, 29 U.S.C. § 1182, the statute's non-discrimination provision. Accordingly, the Departments have developed a regulatory framework that "must be satisfied" to qualify for the statutory exception or safe harbor.

Employers can invoke this safe harbor only if they can demonstrate full compliance with all of its requirements.

3. ERISA's strict regulatory requirements are meant to ensure that wellness programs actually promote health and preclude discrimination, instead of serving as "subterfuge[s] for discriminating based on a health factor."[1] The Final Regulations establish that, for a plan to be compliant, an employer must provide a clearly defined, reasonable alternative standard that allows participants to obtain the "full reward," including retroactive reimbursement of surcharges paid while completing the alternative standard; plans must also provide proper notice to all participants. *See id.* at 33,159–63. First and foremost, a wellness program must be genuinely designed to improve health or prevent disease, rather than functioning as an improper penalty imposed on certain participants under the guise of a health initiative. Defendants' Plan imposes a $15.00 surcharge on every bi-weekly paycheck of every participant who is classified as a "Tobacco/Vape User" and who enrolls in Plan medical coverage—a $390 per year penalty assessed solely on the basis of a health factor—without making available or telling participants about a compliant alternative standard.

4. The need for regulatory safeguards surrounding these types of wellness programs is underscored by studies showing little evidence that wellness programs effectively reduce healthcare costs through health improvement. Instead, the savings

---

[1] *Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158, 33163 (June 3, 2013) (hereinafter the "**Final Regulations**").

employers claim often result from cost-shifting onto employees with higher health risks, disproportionately burdening low-income and vulnerable workers who end up subsidizing their healthier colleagues.[2] The regulatory safeguards seek to prevent wellness programs from being misused as thinly veiled revenue-generating schemes at the expense of employees who are least able to afford the additional costs, by shifting the burden to plan sponsors to demonstrate compliance once a participant alleges discriminatory surcharges. The goal is to ensure that wellness programs operate equitably and in a non-discriminatory manner, and promote genuine health improvements.

5. Outcome-based programs,[3] such as being tobacco-free or completing a smoking cessation program, must offer a clearly defined "*reasonable* alternative standard," which is an alternative way for "all similarly situated individuals" to obtain the reward (or avoid a penalty) if they are unable to meet the initial wellness program standard (i.e., being tobacco-free). Critically, ERISA's implementing regulations

---

[2]Horwitz, J. R., Kelly, B. D., & DiNardo, J. E. (2013). *Wellness incentives in the workplace: Cost savings through cost shifting to unhealthy workers*. Health Affairs, 32(3), 468–476, 474 ("wellness programs may undermine laws meant to prevent discrimination on the basis of health status. Since racial minorities and people with low socioeconomic status are more likely than others to have more health risks, they are also more likely to be adversely affected by cost shifting"); *see also* Dorilas, E., Hill, S. C., & Pesko, M. F. (2022). *Tobacco surcharges associated with reduced ACA marketplace enrollment*. Health Affairs, 41(3), 398, https://www.healthaffairs.org/doi/10.
1377/hlthaff.2021.01313 (last visited Oct. 29, 2026) (finding that tobacco surcharges are significant barriers to affordable health insurance)

[3]"An outcome-based wellness program is a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking or attaining certain results on biometric screenings) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v).

require that "the *same*, *full reward*" be provided to individuals who complete the alternative standard, regardless of when they do so during the plan year.[4] The Department of Labor ("DOL") has made clear that participants should not be forced to rush through the program under the threat of continued surcharges and that every individual participating in the program must receive the same reward as is provided to non-smokers. *Id.* The Departments made this requirement clear when they stated that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual participating in the program*** should be able to receive ***the full amount of any reward or incentive*** . . . ." *Id.*, 33160 (emphasis added). Defendants violate these requirements by failing to make available a reasonable alternative standard that provides full reimbursement to employees who complete it, operating a non-compliant penalty structure rather than a lawful wellness incentive, and failing to clearly notify participants, in all Plan materials describing the surcharge—including benefits guides, plan documents, and summary plan descriptions—of the avenues available to them to avoid the surcharge. These failures constitute direct violations of ERISA's wellness program regulations.

[4] *See* Final Regulations, 33163 ("while an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual*** as is provided to individuals who meet the initial standard for that plan year. (For example, if a calendar year plan offers a health-contingent wellness program with a premium discount and an individual who qualifies for a reasonable alternative standard satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.)" (emphasis added)).

6. Defendants cannot qualify for the statutory safe harbor because, while they impose a health-based surcharge, the surcharge does not comply with the requirements for a lawful wellness program. The Plan implemented by the Defendants fails to satisfy the essential regulatory criteria, which "***must*** be satisfied," for a wellness program to be lawful under ERISA. *Id.* at 33,160 (emphasis added). Its core deficiency is that it does not make available a reasonable alternative standard that provides the "full reward" to ***all*** similarly situated individuals who complete it, as required by 42 U.S.C. § 300gg-4(j)(3)(D) and 29 C.F.R. § 2590.702(f)(4)(iv). Regions' 2025 Benefits Enrollment Guide (the "Enrollment Guide" or "Guide," attached hereto as Ex. A)—the document Regions distributes to associates to make their annual benefit elections—publishes two separate rate tables for every medical plan it offers: one for the "Non-Tobacco/Vape User" and one for the "Tobacco/Vape User." Ex. A at 5. At every coverage tier, every compensation band, and every medical plan, the "Tobacco/Vape User" rate is exactly $15.00 per bi-weekly pay period higher. *Id.* The Guide says nothing else about the surcharge. It identifies no cessation program, no alternative standard, no waiver, no refund, and no contact for obtaining any of them. To the contrary, the Guide tells associates that Open Enrollment "is the only time that you can make changes to your benefits unless you have a qualifying life event during the year." Ex. A at 2. Defendants' own description of the surcharge is therefore a closed door: a participant who is charged the surcharge is told, on the face of the Plan's enrollment materials, that there is no path to avoid it until the following plan year. Defendants thus fail to make available a clearly defined, reasonable alternative

standard that ensures employees have an opportunity to avoid the surcharge. Instead, upon information and belief, Defendants use these unlawfully obtained funds to offset their own contributions to the Plan, which allows additional money to remain in Regions' corporate accounts on which the company can earn interest.

7. Defendants also violate ERISA's wellness program regulations by failing to provide the notice required by statute and regulation, which is an independent basis for liability. Federal law requires that a plan "disclose in ***all plan materials*** describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(E) (emphasis added). Defendants' participant-facing materials describe the tobacco surcharge and the higher premium contributions imposed on tobacco and vape users, but do not disclose any *compliant* alternative avenue that provides all similarly situated individuals with the full reward. Specifically, nowhere in the Enrollment Guide or, upon information and belief, in the Plan's Summary Plan Description ("SPD")[5] or any other participant-facing material describing the surcharge, does Regions disclose: (i) the existence of any reasonable alternative standard to avoid the surcharge; (ii) the availability of the "full reward" (i.e., a refund of the $15.00 per pay period surcharge) to participants who satisfy such an alternative standard; (iii) the regulatory requirement that the recommendations of the participant's personal physician will be accommodated; or (iv) any contact information through which a participant can request or pursue an alternative standard.

[5] *See* Ex. B, generally. The 2025 version of the SPD, a link to which is embedded on page 5 of the Enrollment Guide, contains no reference to any reasonable alternative.

8. Defendants' conduct is unlawful for at least four independent reasons. **First**, Defendants charge a premium differential based on a health factor without satisfying the wellness-program exception. **Second**, Defendants fail to provide the notice required by 42 U.S.C. § 300gg-4(j)(3)(E) and 29 C.F.R. § 2590.702(f)(4)(v) in *any* Plan materials describing the surcharge. **Third**, Defendants' own disclosures establish that participants charged the surcharge cannot change their elections mid-year absent a qualifying life event—and quitting tobacco is not a qualifying life event—a facial violation of the regulatory requirement that participants have the opportunity to qualify for the reward at least once per year, and of the "full reward" requirement, because the surcharge is locked in for the entire plan year regardless of any cessation effort. **Fourth**, upon information and belief, Defendants used the surcharge as a self-funding mechanism: the Plan is funded by both associate contributions and Regions contributions, and every dollar of surcharge collected from participants reduced Regions' own contribution obligation dollar for dollar, in breach of Defendants' fiduciary duties of loyalty under ERISA § 404(a)(1)(A).

9. Because Defendants impose a $15.00 bi-weekly tobacco surcharge and do not provide all similarly situated individuals with at least one opportunity to obtain the full reward, and do not provide the required notice in all Plan materials discussing the surcharge, the Plan fails to satisfy the essential regulatory criteria, which "***must*** be satisfied." Final Regulations, 33160. As a result of these deficiencies, Defendants cannot take advantage of the statutory safe harbor and, therefore, the surcharge

functions as a penalty rather than a compliant wellness incentive. Deficient and misleading notice is a fundamental violation of ERISA's core anti-discrimination purpose: ensuring that participants have a fair and compliant opportunity to be treated the same as non-smokers.

10. Defendants also breached their fiduciary duties under ERISA by collecting and retaining tobacco surcharge payments from participants in a manner inconsistent with governing law and using those funds to offset their own Plan-related contributions. Rather than holding participant contributions for the exclusive benefit of the Plan, Defendants, upon information and belief, commingled surcharge payments with the company's general assets and employer funds, allowing those amounts to reduce Defendants' financial obligations while participants were denied the full reward required by law. This misuse of participant-funded surcharges constitutes a breach of the duties of loyalty and prudence and gives rise to equitable relief, including disgorgement of any profits or financial benefits derived from Defendants' unlawful conduct.

11. This Complaint alleges that Defendants impose a health-based tobacco surcharge without making available a compliant alternative standard to avoid the surcharge. Defendants bear the burden of proving that their tobacco surcharge is lawful by showing that their wellness program fully complies with ***every*** requirement under ERISA. Charging participants a tobacco surcharge while not informing them of a *reasonable* alternative standard that makes available the "full reward," and failing to provide proper notice, makes the surcharge facially noncompliant. No amount of *post*

*hoc* justification can cure these fundamental defects. These types of intentional barriers and restrictions to avoiding health-based surcharges limit engagement with the program, deter participants from making the effort to improve their health, and prevent employers from taking advantage of the statutory safe harbor. Defendants' Plan is not a "program[] of health promotion or disease prevention" as required by ERISA but instead an impermissible cost-shifting scheme that unlawfully penalizes employees for their health status.

12. Participants like Plaintiff are permitted to challenge a surcharge when there is no compliant wellness program made available or when employers provide deficient or misleading information. Once a participant alleges that a surcharge violates ERISA's anti-discrimination provisions along with facts showing the deficiencies in the wellness program, the burden shifts to the employer, Regions, to demonstrate that the wellness program fully satisfies all the statutory and regulatory criteria, including the obligation to make available the "full reward" and to notify participants of the same. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1029 (2025) (reaffirming "that 'the burden of persuasion as to certain elements of a plaintiff's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*.'").

13. At times during the six years prior to the filing of this Complaint, Plaintiff was an employee of Regions who paid the unlawful tobacco surcharge to maintain health insurance coverage under the Plan. This surcharge imposed an additional

financial burden on Plaintiff and continues to impose such a burden on those similarly situated.

14. Upon information and belief, the number of tobacco and vape users who have enrolled in the Plan reflects that found in the general population of working-age adults in the United States and would represent approximately 10 percent of Plan participants, resulting in payment of the improper Regions tobacco surcharge by thousands of individuals in each year from 2020 to the present.

15. Plaintiff brings this lawsuit individually and on behalf of all similarly situated Plan participants and beneficiaries, seeking to recover these unlawfully charged fees and Plan-wide equitable relief to prevent Defendants from continuing to profit from their violations under 29 U.S.C. § 1109. Under 29 U.S.C. § 1109, Defendants are fiduciaries of the Plan who have a legal obligation to act in the best interests of Plan participants and to comply with federal law. Plaintiff, on behalf of Plaintiff and the Plan as a whole, seeks appropriate equitable relief under 29 U.S.C. §§ 1132(a)(2) and (a)(3) to address Defendants' ongoing violations of ERISA's anti-discrimination provisions.

## PARTIES

16. Plaintiff is, and at all times mentioned herein was, an individual citizen of the State of Florida. Plaintiff was an associate of Regions working and living in Clay County Florida. Plaintiff was an associate of Regions who paid a tobacco surcharge of $15.00 per bi-weekly pay period (roughly $390 annually) under the Plan. Plaintiff

was required to pay this tobacco surcharge to maintain health insurance under the Plan.

17. Plaintiff is a participant in the Plan pursuant to 29 U.S.C. § 1002(7).

18. Regions Financial is a Delaware corporation with its principal place of business at 1900 Fifth Avenue North, Birmingham, Alabama 35203. Regions Financial is a publicly traded bank holding company that, through its subsidiary Regions Bank, provides consumer and commercial banking, wealth management, and mortgage products and services through a network of branches across the South, Midwest, and Texas. Regions Financial is the Plan sponsor within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and is identified as the Plan Sponsor in the SPD. Ex. B at 1. Regions Financial exercises discretionary authority and control over the management and administration of the Plan, including the design, implementation, and communication of the tobacco surcharge, and is therefore a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). At all relevant times, Regions employed approximately 20,000 associates and maintained a Plan covering thousands of participants and beneficiaries. The Plan is an employee welfare benefit plan subject to ERISA, 29 U.S.C. § 1002(1) and (3).

19. Regions Bank is an Alabama state-chartered banking corporation headquartered in Birmingham, Alabama, and is the principal operating subsidiary of Regions Financial. Regions Bank was the employer of Plaintiff and employed and continues to employ members of the Class, prepares and distributes the Enrollment Guide and other benefits communications to associates (the Enrollment Guide bears

the notation "© 2025 Regions Bank"), withholds Plan contributions, including the tobacco surcharge, from associates' pay through its Workday payroll system, and, upon information and belief, is a participating employer in and co-sponsor of the Plan. Regions Bank exercises discretionary authority and control over the administration of the Plan and the disposition of participant contributions, and is therefore a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

20. Defendants John Does 1–20 are individuals, the identities and capacities of whom are presently unknown to Plaintiff, who exercised discretionary authority over the administration, management, or disposition of Plan assets, including the tobacco surcharge, and are therefore fiduciaries under ERISA § 3(21)(A). Plaintiff reserves the right to amend the Complaint to identify these Defendants when their identities are ascertained.

## JURISDICTION AND VENUE

21. The Court has subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, as this suit seeks relief under ERISA, a federal statute. Upon information and belief, the number of class members exceeds 1,000, many of whom have different citizenship from Defendants. Thus, minimal diversity also exists under 28 U.S.C. § 1332(d)(2)(A).

22. This Court has personal jurisdiction over Plaintiff because at times during the relevant time period, Plaintiff resided and worked in the State of Florida in Clay County in this District. Regions Financial and Regions Bank maintain dozens of

branch locations in this District at which they conduct business, and through which the Plan administers benefits to participants and beneficiaries. Plaintiff's claims and the claims of others similarly situated arise from the acts and omissions of Defendants with respect to their activities and conduct in the State of Florida, and Defendants have purposefully availed themselves of the privilege of conducting business in the State of Florida.

23. Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2) because the Plan is administered in part in this District, breaches alleged herein as to the Plaintiff took place in this District, and Regions maintains numerous places of business, conducts business, and may be found in this District. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial portion of Defendants' administration of the tobacco surcharge occurred in and affected property in this District, including as to Plaintiff, and upon information and belief, numerous Plan participants in the this District.

## FACTUAL BACKGROUND

### I. DEFENDANTS' TOBACCO SURCHARGE VIOLATES ERISA'S ANTI-DISCRIMINATION RULE

#### A. Statutory and Regulatory Requirements

24. Congress amended ERISA to prohibit any health insurer or medical plan from discriminating against participants in providing coverage or charging premiums based on a "health-related factor," including tobacco use. Under this rule, a plan "may

not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution that is greater than such premium or contribution for a similarly situated individual enrolled in the plan based on any health-related factor in relation to the individual or to an individual enrolled under the plan as a dependent of the individual." ERISA § 702(b)(1), 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).

25. The statute permits group health plans to "establish[] premium discounts or rebates . . . in return for adherence to ***programs of health promotion and disease prevention***" (29 U.S.C. § 1182(b)(2)(B) (emphasis added)); however, these "wellness programs"—to qualify for this statutory safe harbor exception—must strictly adhere to the mandated regulatory requirements.

26. Under ERISA § 505, 29 U.S.C. § 1135, Congress granted the Department of Labor the authority to issue regulations, including the power to establish regulations prohibiting discrimination against participants and beneficiaries based on their health status under ERISA § 702, 29 U.S.C. § 1182. This authority empowers the Secretary of Labor (the "Secretary") to "prescribe such regulations as he finds necessary or appropriate to carry out the provisions of" Title I of ERISA. 29 U.S.C. § 1135. Furthermore, ERISA § 734, 29 U.S.C. § 1191c, explicitly reinforces the Secretary's authority to issue regulations concerning group health plan requirements, granting the power to "promulgate such regulations as may be necessary or appropriate to carry out the provisions" of ERISA Title I, Part 7. 29 U.S.C. § 1191c.

27. Exercising this delegated authority, in 2006 the Secretary issued regulations through the notice-and-comment rulemaking process outlining the criteria that a wellness program must meet to qualify for the premium non-discrimination exception under ERISA § 702(b). *See* Final Regulations, 33158–59. Following the amendments made by the Patient Protection and Affordable Care Act in 2010, the Departments published proposed regulations in November 2012 to "amend the 2006 regulations regarding nondiscriminatory wellness programs." *Id.*, 33159. These regulations (i.e., the Final Regulations) were approved and signed in 2013 and became effective January 1, 2014. *Id.*, 33158.

28. The Final Regulations specify that health promotion or disease prevention programs, such as outcome-based wellness initiatives (i.e., smoking cessation programs), must meet detailed requirements to qualify for the statutory safe harbor. As the Departments explained, these criteria "***must be satisfied*** in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status." *Id.*, 33163 (emphasis added). "That is," the Departments explained, "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants. *Id.* (emphasis added). That means once a participant alleges a discriminatory surcharge along with facts showing that the alternative standard offered to them is deficient (or non-existent), the burden shifts to the employer to prove that the wellness program satisfies *all* of the necessary criteria.

29. The criteria in the Final Regulations are not optional. They serve as the only lawful pathway for plans to impose health-based premium differentials by ensuring that wellness programs do not arbitrarily penalize participants and preventing employers from using surcharges as a revenue-generating mechanism rather than a genuine tool for health promotion. If a wellness program fails to meet even one of these stringent requirements, the program is noncompliant and the employer cannot benefit from the statutory carve-out. *See* § 2590.702(f)(4) (describing the "[r]equirements for outcome-based wellness programs," and stating that a program "does not violate the provisions of this section ***only if <u>all</u> of the [] requirements are satisfied***" (emphasis added)).

**B. Regulatory Criteria**

30. To comply with ERISA and avoid unlawful discriminatory surcharges, outcome-based wellness programs must meet the following five (5) criteria:

(a) Frequency of opportunity to qualify: Participants must be given at least one chance annually to qualify for the reward associated with the program to ensure ongoing accessibility and fairness. 29 C.F.R. § 2590.702(f)(4)(i).

(b) Size of reward: Penalties or rewards cannot exceed 50% of the cost of employee-only coverage. § 2590.702(f)(4)(ii).

(c) Reasonable design: Programs must be "reasonably designed" to promote health and cannot be "a subterfuge for discriminating

based on a health factor." This determination is based on all the relevant facts and circumstances. "To ensure that an outcome-based wellness program is reasonably designed to improve health and does not act as a subterfuge for underwriting or reducing benefits based on a health factor, a reasonable alternative standard to qualify for the reward must be provided to any individual who does not meet the initial standard based on a measurement, test, or screening. . . ." § 2590.702(f)(4)(iii).

(d) Uniform availability and reasonable alternative standards: "The full reward under the outcome-based wellness program must be available to all similarly situated individuals." § 2590.702(f)(4)(iv).

(e) Notice of availability of reasonable alternative standard: Notice must include (a) instructions on how to access the reasonable alternative standard; (b) contact information for inquiries about the alternative standard; and (c) an explicit statement that participants' personal physician's recommendations will be accommodated. *See* § 2590.702(f)(4)(v).

31. The Departments provided valuable insight into each of the criteria, reflecting their intent to operationalize the statute's protections in a manner that both promotes health and prevents discriminatory practices under ERISA.

32. Regarding the first criterion, "the once-per-year requirement was included as a bright-line standard for determining the minimum frequency that is

consistent with a reasonable design for promoting good health or preventing disease." Final Regulations, 33162. The once-per-year requirement ensures that participants have a meaningful opportunity to participate in a reasonable alternative standard.

33. A key requirement of the fourth criterion for outcome-based programs is that the "full reward" must be available to "all similarly situated individuals[,]" regardless of when they meet the reasonable alternative standard during the plan year. *See* Final Regulations, 33165. Critically, the Departments clearly state that it is "[t]he intention of the Departments . . . that, regardless of the type of wellness program, ***every individual*** participating in the program should be able to receive the ***full amount of any reward or incentive*** . . . ." *Id.* (emphasis added). While plans have flexibility in determining the manner in which they provide the "full reward," providing the "full reward" to every participant is ***mandatory***, regardless of when the participant satisfies the alternative standard. The Departments have made this clear:

> While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***.

Final Regulations, 33163 (emphasis added).

34. The Final Regulations provide an example of a non-compliant plan that imposes a tobacco use surcharge but does not facilitate the participant's enrollment in, or participation in, a smoking cessation program. *See id.*, Example 8. Instead, the employer advises the participant to find a program, pay for it, and provide a certificate of completion. *Id.* The Final Regulations conclude that the plan is not compliant because it "has not offered a reasonable alternative standard . . . and the program fails to satisfy the requirements of paragraph (f) of this section." *Id.*; Final Regulations, 33180.

35. For health-contingent wellness programs, the Final Regulations require that the notice be disclosed "in ***all*** plan materials describing the terms of" the program. 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v) (emphasis added). Further, the Final Regulations establish that "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the summary plan description (SPD), as well as in the applicable governing plan documents . . . if compliance with the wellness program affects premiums . . . under the terms of the plan." Final Regulations, 33166. Plans that charge their participants more and fail to inform participants of a reasonable alternative standard to the surcharge violate these requirements.

## II. DEFENDANTS CANNOT AVAIL THEMSELVES OF ERISA'S SAFE HARBOR

### A. The Plan

36. The Plan is an "employee welfare benefit plan" within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), and a "group health plan" within the meaning of ERISA § 733(a)(1), 29 U.S.C. § 1191b(a)(1).

37. The Plan offers medical coverage to Regions associates through two options administered by Credence Blue Cross Blue Shield ("Credence"): the "Credence BCBS Core High Deductible Health Plan" (the "Core Plan") and the "Credence BCBS Advantage PPO Plan" (the "Advantage Plan"). Ex. A at 6–7. Associates in Southern California may instead elect a Kaiser Permanente Traditional HMO. *Id.* at 6. Upon information and belief, the Core and Advantage Plans are self-funded: Regions pays covered claims from its general assets and participant contributions, and Credence serves as third-party claims administrator. The Enrollment Guide describes Credence as the entity that "administer[s]" the Regions Medical Plans and lists Credence as the contact for "Medical . . . COBRA Billing," consistent with a self-funded arrangement. *Id.* at 6, 20.

38. The Plan is funded by both employer and associate contributions. The Enrollment Guide is explicit that Regions and its associates share the cost of medical coverage: it announces "modest increases to health care premiums for 2025" and states that "Regions will pay most of the increased cost of health care while maintaining existing medical coverage levels." Ex. A at 2. The Guide then publishes the "2025

Associate Contributions Per Bi-Weekly Pay Period"—the portion of the cost of coverage that associates must pay—for each medical, dental, vision, and legal plan. *Id.* at 5. Associates pay their share of the cost through payroll deductions taken from each bi-weekly paycheck. Upon information and belief, medical contributions, like the dental and flexible spending account contributions described in the Guide, are withheld "on a pre-tax basis" as salary-reduction contributions under a cafeteria plan maintained pursuant to Section 125 of the Internal Revenue Code. *See id.* at 8, 10.[6]

39. Upon information and belief, and consistent with the structure of self-funded plans sponsored by employers of Regions' size, the Plan's governing documents provide that participant contributions are applied first to pay benefits and that Regions contributes only the remaining cost of coverage. Under that structure, every dollar of participant contribution—including every dollar of tobacco surcharge—directly offsets Regions' own contribution obligation, dollar for dollar.

**B. The Tobacco/Vape Surcharge**

40. The Plan imposes a tobacco surcharge on every participant who is classified as a "Tobacco/Vape User" and enrolls in Plan medical coverage. The Enrollment Guide, which is distributed to associates in connection with the Open

---

[6]Unless otherwise noted, quoted Plan language is taken from Regions' 2025 Benefits Enrollment Guide (REG1-AEB-2025-BR (Rev. 1/25)), attached hereto as Exhibit A. Page citations are to the Guide's printed page numbers. While 2025 SPD is also attached to this complaint as Exhibit B, Plaintiff will seek all applicable versions of the Plan's SPD, wrap plan document, and Forms 5500 from Defendants pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), and reserves the right to amend this Complaint to add those documents as exhibits.

Enrollment period that "begins October 28 and runs through November 8," Ex. A at 2, describes the surcharge solely by way of duplicate rate tables. For each medical option—the Core Plan, the Advantage Plan, and the Kaiser HMO—the Guide prints one table of bi-weekly contributions for the "Non-Tobacco/Vape User" and a second table for the "Tobacco/Vape User." *Id.* at 5. At every coverage tier (Associate Only; Associate + Child(ren); Associate + Spouse/Domestic Partner; Family or Family + Domestic Partner) and in both compensation bands ("$70,000 and Under" and "$70,000.01 to $140,000"), the "Tobacco/Vape User" rate is exactly $15.00 per pay period higher than the "Non-Tobacco/Vape User" rate. *Id.* By way of example:

(a) Core Plan, Associate Only, Total Compensation $70,000 and Under: $30.50 (Non-Tobacco/Vape User) versus $45.50 (Tobacco/Vape User);

(b) Core Plan, Family, Total Compensation $70,000 and Under: $162.25 versus $177.25;

(c) Advantage Plan / Kaiser HMO, Associate Only, Total Compensation $70,000 and Under: $85.00 versus $100.00; and

(d) Advantage Plan / Kaiser HMO, Family, Total Compensation $70,000.01 to $140,000: $320.00 versus $335.00.

*Id.* Upon information and belief, the surcharge has been imposed in materially identical form for the 2025 Plan Year, each Plan Year thereafter, and each Plan Year since at least 2020.[7]

41. Because Regions pays its associates bi-weekly, the tobacco surcharge imposes an annualized cost of $390 per year on every participant classified as a tobacco or vape user. For low- and middle-wage associates, the surcharge is a substantial percentage of paycheck deductions and a real-dollar barrier to coverage. For an associate earning $70,000 or less and selecting Regions' lowest-cost option—Associate Only coverage under the Core Plan—the $15.00 surcharge increases the amount withheld for medical coverage from $30.50 to $45.50 per paycheck, an increase of nearly 50 percent. Ex. A at 5. Notably, the surcharge is a flat dollar amount that does not vary with compensation, so it falls hardest, in percentage terms, on Regions' lowest-paid associates.

42. The Enrollment Guide does not define "Tobacco/Vape User" for purposes of the medical plans, does not describe the attestation by which an associate is classified as a tobacco or vape user, and does not explain how an associate can change that classification. The only place the Guide addresses what it means to be a non-tobacco user is in its discussion of optional life insurance, where it states: "To

[7] The Enrollment Guide advises participants that no changes have been made to coverage from at least plan year 2023 through Plan year 2025, stating that "like last year, Open Enrollment will be a passive enrollment. This means that you will see current coverage levels already entered into the system. If you make no changes or cancellation of benefits, your 2024 benefit elections will roll over exactly as is for 2025." Ex. A at 2.

elect the lower, non-tobacco-user rates, you must not have used any tobacco products or e-cigarettes during the previous 12 months." Ex. A at 13. Upon information and belief, Regions applies the same or a similar twelve-month look-back standard in classifying associates as "Tobacco/Vape User[s]" for purposes of the medical plans. To the extent it does, an associate who quits tobacco in, for example, February of a Plan Year cannot truthfully attest to non-tobacco status at the following Open Enrollment, and will therefore pay the surcharge not only for the balance of the year in which he or she quit, but for the entirety of the following Plan Year as well—a penalty of more than $700 for an associate who has already stopped using tobacco.

43. The Enrollment Guide also makes clear that the "Tobacco/Vape User" classification, once elected, is locked in for the entire Plan Year. The Guide instructs associates, in a box captioned "IMPORTANT: CHECK YOUR COVERAGE!," that "the Open Enrollment period is the only time that you can make changes to your benefits unless you have a qualifying life event during the year." Ex. A at 2. The Guide further explains that Open Enrollment is a "*passive* enrollment," meaning that "[i]f you make no changes or cancellation of benefits, your 2024 benefit elections will roll over exactly as is for 2025." *Id.* Ceasing to use tobacco is not a "qualifying life event" under the Plan or under the change-in-status rules governing cafeteria plans. *See* Treas. Reg. § 1.125-4. Accordingly, an associate classified as a tobacco or vape user at Open Enrollment will pay the surcharge for all 26 pay periods of the Plan Year no matter what he or she does during the year, and an associate who quit tobacco during the

prior year but did not affirmatively re-elect coverage as a non-tobacco user will have the surcharge "roll over exactly as is," continuing to pay regardless of actual use.

44. The tobacco surcharge is a "health-contingent wellness program" within the meaning of 29 C.F.R. § 2590.702(f)(1)(ii) because it varies premium contributions based on whether an individual satisfies a standard related to a health factor (non-use of tobacco or e-cigarettes). *See Baker v. 7-Eleven Inc.*, No. 3:25-cv-01609-X, 2026 WL 473252, at *4-*5 (N.D. Tex. Feb. 19, 2026). It is unlawful under 29 U.S.C. § 1182(a)–(b) unless it satisfies each of the conditions set forth in 42 U.S.C. § 300gg-4(j) and 29 C.F.R. § 2590.702(f)(4).

45. The Enrollment Guide is not an informal or ancillary communication. It is a Plan document. By its own terms, "[t]he enrollment guide is a Summary of Material[] Modifications and is intended to provide select highlights of the plans," and "[i]f a discrepancy exists between this communication and the official plan documents, this communication will govern." Ex. A, back cover; *see also id.* at 6 ("In the event of a discrepancy, plan changes listed in this guide will prevail."). A summary of material modifications is a document ERISA requires plan administrators to furnish to participants, *see* ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1), and Regions has expressly designated the Guide as the controlling statement of the Plan's terms for 2025. The Guide is therefore both a "plan material[] describing the terms of the wellness program" within the meaning of 42 U.S.C. § 300gg-4(j)(3)(E) and one of the applicable governing plan documents in which the Departments require wellness program terms to be disclosed. Final Regulations, 33166.

### C. Defendants Fail to Provide, or Disclose, Any Reasonable Alternative Standard

46. Defendants' tobacco surcharge is discriminatory because Defendants do not make available a compliant outcome-based wellness program that ensures that all similarly situated individuals have at least one annual opportunity to obtain the full reward upon completion of an alternative standard during the Plan Year. To satisfy the wellness-program exception, the Plan must (i) make available a reasonable alternative standard, or waiver, by which a participant can avoid the surcharge; (ii) make available the "full reward" to all participants who satisfy that alternative standard; and (iii) provide the participant an opportunity to qualify for the reward at least once per year. *See* 42 U.S.C. § 300gg-4(j)(3)(B)–(E); 29 C.F.R. § 2590.702(f)(4)(i)–(v).

47. Upon information and belief, no participant-facing Plan material describes any reasonable alternative standard to the tobacco surcharge. The Enrollment Guide—the principal participant-facing document describing the surcharge, and a document Regions itself designates as a governing Summary of Material Modifications—describes only the surcharge itself. The phrase "Tobacco/Vape User" appears in the Guide only as the heading of rate tables. Ex. A at 5. The Guide does not state that any alternative standard exists, does not state that the surcharge can be avoided or refunded by completing a cessation program or any other alternative, and does not state how a participant might satisfy any such alternative. Neither the Guide's "WHAT'S NEW IN 2025" section nor its

"CHANGES TO YOUR 2025 BENEFITS" chart—which together purport to catalog every change to the Plan for the 2025 Plan Year—mentions any tobacco cessation program or reasonable alternative standard. *Id.* at 2, 4.

48. The Enrollment Guide's references, elsewhere in the document, to generic wellbeing resources do not satisfy the regulation. The Guide promotes "Well," which it describes as Regions' "gateway to wellbeing" and an app that "suggests actions and small steps that you can take to improve your health and wellbeing, and earn gift cards along the way"; "Headspace Health," the Plan's employee assistance program, which offers "free short-term counseling" for issues including "[a]lcohol and other drug dependency"; "Pack Health," a "Health Coaching" vendor listed on the Guide's contact page; and "Virta," a weight-loss program. Ex. A at 3, 16–17, 20. The Guide never describes any of these resources as a reasonable alternative standard, never states that using any of them allows a participant to avoid or recover the tobacco surcharge, never identifies what a participant must do to satisfy such an alternative, and never describes the reward available upon completion. None of them is even described as a tobacco cessation program. A list of wellness vendors and telephone numbers that does not describe terms, conditions, or rewards is not an "alternative standard."

49. Even assuming *arguendo* that Regions intended one of these resources, or some other program, to operate as a reasonable alternative standard, upon information and belief no Plan material informs participants of that intention or of the path by which completion translates into the full reward. The Final Regulations expressly

forbid reliance on undisclosed alternatives: a wellness program does not satisfy the safe harbor unless the alternative is "disclose[d] in all plan materials describing the terms of [the] wellness program." 42 U.S.C. § 300gg-4(j)(3)(E); 29 C.F.R. § 2590.702(f)(4)(v).

50. Because there is no reasonable alternative standard, Defendants fail to make available the full reward. The "full reward" requirement provides that the alternative standard, if satisfied, must result in similarly situated individuals receiving the same reward the non-tobacco user receives, not a prorated or prospective fraction of it. 42 U.S.C. § 300gg-4(j)(3)(D); 29 C.F.R. § 2590.702(f)(4)(iv). The Departments confirmed as much in the preamble. *See* 78 Fed. Reg. at 33163.

51. Defendants violate the full reward requirement on the face of their own materials. The Enrollment Guide tells participants that Open Enrollment "is the only time that you can make changes to your benefits unless you have a qualifying life event during the year." Ex. A at 2. That language confirms that, even if a participant entirely ceased tobacco use mid-year, completed a cessation program, or obtained a physician's recommendation, the participant would continue to be charged the $15.00 bi-weekly surcharge for the balance of the Plan Year. By Defendants' own admission, the most any participant could ever obtain is a *prospective* reduction beginning the following Plan Year—and, to the extent Regions applies a twelve-month look-back, not even that—which is not sufficient to satisfy the statutory and regulatory requirements.

52. Defendants also fail to provide an opportunity to qualify for the full reward at least once per year. The statute and Final Regulations require that "[t]he full reward . . . be available to all similarly situated individuals," and that individuals be

given the opportunity to "qualify for the reward under the program at least once per year." 42 U.S.C. § 300gg-4(j)(3)(C); 29 C.F.R. § 2590.702(f)(4)(i). These are independent requirements: the once-per-year opportunity must be a meaningful opportunity to obtain the *full* reward for the relevant Plan Year, not merely an opportunity to re-attest at next year's Open Enrollment.

53. Defendants' lock-in provision—whereby participants cannot change their elections, including their tobacco classification, until the next Open Enrollment absent a qualifying life event—confirms that no in-year opportunity to qualify for the reward exists. Defendants' design treats annual Open Enrollment as the *only* opportunity for non-tobacco-user pricing, and even then only on a prospective basis. That design forfeits the safe harbor.

54. Defendants fail to provide the required notice in all Plan materials describing the surcharge. The wellness-program exception requires the Plan to "disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard to qualify for the reward (and, if applicable, the possibility of waiver of the otherwise applicable standard)." 42 U.S.C. § 300gg-4(j)(3)(E). Defendants' Enrollment Guide is a "plan material describing the terms of the wellness program" within the meaning of 42 U.S.C. § 300gg-4(j)(3)(E) because it describes the surcharge, its trigger (classification as a "Tobacco/Vape User"), its amount ($15.00 per bi-weekly pay period at every tier of every medical plan), and its duration (the entire Plan Year, because elections may be changed only at Open Enrollment). The Guide contains no statement of the availability of any

reasonable alternative standard, no contact information for obtaining one, and no statement that the recommendations of a participant's personal physician will be accommodated. The omission of each of these elements independently violates the notice requirement.

55. The Plan's SPD likewise fails to disclose any of the required elements. ERISA § 102, 29 U.S.C. § 1022, and 29 C.F.R. § 2520.102-3(l) require the SPD to describe the Plan's contribution structure, premium differentials, and wellness program terms. As the Departments explained, wellness program terms, including the availability of any reasonable alternative standard, are "generally required to be disclosed in the summary plan description (SPD) . . . if compliance with the wellness program affects premiums, cost sharing, or other benefits under the terms of the plan." Final Regulations, 78 Fed. Reg. at 33166. The Plan's SPD confirms the omission. The 2025 Core Plan SPD—a 74-page document titled "Regions Financial Corporation Group Healthcare Plan"[8]—does not contain the words "tobacco," "vape," or "smoking." It does not mention that contributions differ based on tobacco use, does not describe any wellness program, and does not disclose any reasonable alternative standard, the right to the full reward, contact information for obtaining an alternative, or the accommodation of a participant's personal physician's recommendations. The SPD's only reference to nicotine is an exclusion: "Services or expenses of any kind for nicotine addiction except as provided under . . . Physician Preventive Benefits." Ex. B

[8] *See* Ex. B.

at 45. The SPD instead provides that the amounts associates must pay "will be furnished by the group in writing and will constitute a part of this plan," Ex. B at 66, thereby incorporating the Enrollment Guide's rate tables—and nothing else—as the Plan's governing statement of the premium differential.

56. These notice omissions independently violate ERISA's wellness program structure and preclude Defendants from invoking the statutory safe harbor for health-contingent wellness programs. By presenting the tobacco-related premium differential without disclosing in any participant-facing material an entitlement to a reasonable alternative standard, the full reward, or the availability of the physician-accommodation process, Defendants have administered a program that is opaque, inaccessible, and structured in a manner that deters participation rather than promoting health.

57. The Final Regulations provide a stark comparator to the Enrollment Guide in Example 6 under 29 C.F.R. § 2590.702(f)(4)(vi), which outlines the characteristics of a group health plan offering a hypothetical, *compliant* tobacco surcharge program:

> In conjunction with an annual open enrollment period, a group health plan provides a premium differential based on tobacco use, determined using a health risk assessment. The following statement is included in all plan materials describing the tobacco premium differential: "Stop smoking today! We can help! If you are a smoker, we offer a smoking cessation program. If you complete the program, you can avoid this surcharge." The plan accommodates participants who smoke by facilitating their enrollment in a smoking cessation program that requires participation at a time and

> place that are not unreasonably burdensome or impractical for participants, and that is otherwise reasonably designed based on all the relevant facts and circumstances, and discloses contact information and the individual's option to involve his or her personal physician. The plan pays for the cost of participation in the smoking cessation program. Any participant can avoid the surcharge for the plan year by participating in the program, regardless of whether the participant stops smoking, but the plan can require a participant who wants to avoid the surcharge in a subsequent year to complete the smoking cessation program again.

58. The Final Regulations highlight the ways in which the tobacco surcharge described in Example 6 satisfies the requirements of ERISA for an outcome-based wellness program, like that implemented by Regions, in which the initial standard for obtaining a reward is dependent on the results of a health risk assessment or attestation (a measurement, test, or screening).

59. The program in Example 6 is reasonably designed under 29 C.F.R. § 2590.702(f)(4)(iii) because the plan provides a reasonable alternative standard (as required under paragraph (f)(4)(iv)) to qualify for the reward to all tobacco users—in that case, a smoking cessation program, which is paid for by the plan and in which participation is facilitated, at a time and place that are not unreasonably burdensome or impractical for participants. The participant can also earn the "full reward" by avoiding the surcharge for the plan year by participating in the program, regardless of whether the participant is actually able to quit.

60. The plan described in Example 6 also meets the strict notice requirements under ERISA's regulations, because it provides, ***in all materials describing the terms of***

***the program***, notice of the availability of the reasonable alternative standard, including contact information and the individual's option to involve his or her personal physician.

61. Unlike the plan in Example 6, Regions does not provide participants with *any* reasonable alternative standard to avoid the tobacco surcharge it imposes on participants. There is no smoking cessation program, waiver, or alternative route for tobacco or vape users to obtain the "full reward" (i.e., avoiding the surcharge). The only way for tobacco and vape users to avoid the surcharge is to quit, remain tobacco-free for whatever look-back period Regions applies, and change their classification at the next Open Enrollment. Thus, tobacco and vape users are penalized based solely on their status, which violates ERISA's non-discrimination provisions.

62. Unlike the plan in Example 6, Regions did not include clear and specific notice of the availability of a reasonable alternative standard ***in all Plan materials discussing the surcharge***. Regions did not state in its Plan materials that an alternative standard (or waiver) was available, and Regions did not provide contact information for obtaining the alternative standard. Nor did Regions include a statement that the Plan would accommodate the recommendations of the participant's personal physician regarding the medical appropriateness of the alternative standard. Where Regions wanted to tell associates how to take advantage of a program, it knew how to do so: the Guide contains step-by-step instructions, telephone numbers, URLs, and QR codes for Well, Headspace, Virta, and the Plan's other vendors. Ex. A at 3, 16–17, 20. It contains nothing comparable for avoiding the tobacco surcharge.

63. Had Defendants structured the program in compliance with ERISA, by making available, and notifying participants of, a compliant reasonable alternative standard, participants would have been aware of the avenues available to avoid the surcharge and the steps needed to do so. Instead, Defendants failed to make available such a program or to tell any participants how they could avoid the surcharge.

64. Plaintiff paid the tobacco surcharge and did not receive information describing a reasonable alternative standard. Had Defendants provided clear and compliant disclosures and a genuinely reasonable alternative, Plaintiff and similarly situated participants could have taken timely steps to obtain the full reward. Instead, they were deprived of the meaningful opportunity guaranteed by ERISA and subjected to ongoing financial penalties based on a health factor.

65. Allowing entities like Regions to exploit participants and unlawfully extract substantial sums annually from them without making available a compliant wellness program transforms the surcharge into a "subterfuge for discrimination" and undermines ERISA's purpose of protecting workers from health-based discrimination. If unchecked, this practice would permit employers to manipulate wellness programs as revenue-generating schemes rather than genuine health initiatives, shifting unjust financial burdens onto employees in violation of federal law. This type of conduct violates not only ERISA's anti-discrimination rules governing wellness programs but also the statute's fiduciary duties of loyalty and prudence, as Defendants failed to administer the Plan solely in the interest of participants.

## III. DEFENDANTS' SELF-DEALING AND MISMANAGEMENT OF PLAN FUNDS

66. Defendants administered the tobacco surcharge by communicating, each year, with participants about the terms governing the wellness program; by designating which participants qualify to have the surcharge removed and when; and by determining how the surcharge proceeds were used. Defendants withhold the tobacco surcharge directly from participants' bi-weekly paychecks as pre-tax salary-reduction contributions, included within medical premium contributions. These surcharge withholdings are funding for Plan coverage, not separate penalties, and are treated the same way as other Plan contributions. Amounts withheld from participants' wages as contributions to the Plan become Plan assets as soon as they can reasonably be segregated from the employer's general assets. *See* 29 C.F.R. § 2510.3-102.

67. The Enrollment Guide makes clear that medical coverage is funded by both Regions and participant contributions, and that the two are inversely related: when the cost of coverage rises, "Regions will pay most of the increased cost" while associates pay the balance through the published contribution rates. Ex. A at 2, 5. Upon information and belief, the Plan's governing documents provide that participant contributions are applied first to pay benefits and that Regions contributes only the remainder. That means every dollar of participant contribution, including every dollar of tobacco surcharge, reduces the amount of employer contribution that Regions would otherwise have had to commit to the Plan.

68. By layering a $15.00 bi-weekly tobacco surcharge on top of participants' required medical premium contributions, Defendants created what should have been a third stream of funding into the Plan: (i) participants' required medical premium contributions; (ii) Regions' promised employer contribution; and (iii) the additional tobacco surcharge. Instead of allowing all three streams to flow into the Plan as a benefit to participants, Defendants, upon information and belief, used the tobacco surcharge to offset and reduce Regions' funding obligation. Because the cost of coverage for each tier is fixed at the start of each Plan Year, every dollar of surcharge collected reduced the company's contribution dollar for dollar. The surcharge did not increase resources available to the Plan; it simply shifted costs away from Regions and onto participants.

69. This practice constitutes classic self-dealing. Defendants used the mechanisms of the Plan (i.e., the salary-reduction structure, the Plan's funding hierarchy, and the wellness program apparatus) to realize savings for the company itself, depriving the Plan of the full benefit of the three distinct funding streams it should have received. In doing so, Defendants failed to act solely in the interest of participants and beneficiaries, as ERISA requires. Rather than use the surcharge proceeds to, for example, offset the premiums of non-tobacco users or reduce future premium increases, Defendants used the surcharge to relieve Regions of a contribution obligation that it otherwise would have had to satisfy out of corporate funds. Upon information and belief, the contribution dollars that Regions thereby avoided contributing to the Plan remained in its own corporate accounts and earned interest

for Regions, while the Plan was deprived of the full amount of employer funding it should have received. This diversion violates ERISA's duty of loyalty under 29 U.S.C. § 1104(a)(1)(A) and constitutes a prohibited transaction under 29 U.S.C. § 1106.

## CLASS DEFINITION AND ALLEGATIONS

70. Plaintiff brings this action individually and on behalf of all other similarly situated individuals, pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure.

71. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> **Tobacco Surcharge Class**
>
> All individuals residing in the United States who, during the relevant time period, paid a tobacco or vape surcharge (including by being charged the "Tobacco/Vape User" contribution rate) in connection with their participation in a health or welfare plan sponsored by Defendants.

72. Excluded from the Class are Defendants' officers and directors. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

73. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a) and (b)(1).

74. Numerosity. This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Plaintiff is informed, believes, and thereon alleges that the proposed Class contains thousands of participants who have been damaged by Defendants' conduct as alleged

herein, the identities of whom are within the knowledge of Defendants and can be easily determined through Defendants' records.

75. Commonality. This action involves questions of law and fact common to the Class. The common legal and factual questions include, but are not limited to, the following:

(a) Whether Defendants' tobacco surcharge discriminates against participants based on a health status-related factor;

(b) Whether Defendants make available a reasonable alternative standard by which a participant could receive the "full reward" of the tobacco surcharge;

(c) Whether Defendants provided the required notice in ***all*** the Plan materials describing the surcharge;

(d) Whether Defendants provided the required statement that participants' personal physicians' recommendations would be accommodated in all Plan materials describing the surcharge;

(e) Whether Defendants' wellness program violates ERISA and the Final Regulations;

(f) Whether Defendants breached their fiduciary duties by collecting and retaining the tobacco surcharge to offset their own contributions to the Plan;

(g) Whether Defendants breached their fiduciary duties by administering a Plan that refuses to reimburse participants who complete an alternative standard;

(h) Whether Defendants breached their fiduciary duties by failing to periodically review the terms of their wellness program and the communications sent to participants to ensure compliance with ERISA and applicable regulations;

(i) Whether Regions breached its fiduciary duty by failing to monitor the activities of the Committee; and

(j) The appropriate mechanisms to determine damages on a class-wide basis.

76. Typicality. Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members have been injured through the uniform misconduct described above and were charged improper and unlawful tobacco surcharges. Moreover, Plaintiff's claims are typical of the Class members' claims because Plaintiff is advancing the same claims and legal theories on behalf of Plaintiff and all members of the Class. In addition, Plaintiff is entitled to relief under the same causes of action and upon the same facts as the other members of the proposed Class.

77. Adequacy of Representation. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff and members of the Class each participated in health and welfare plans offered by Defendants and were harmed by Defendants' misconduct in that they were assessed unfair and discriminatory tobacco

surcharges. Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained competent counsel experienced in complex litigation and class action litigation. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

78. Plaintiff seeks declaratory and equitable relief on grounds generally applicable to the Class. Unless the Class is certified, Defendants will be allowed to profit from their unfair and discriminatory practices, while Plaintiff and the members of the Class will have suffered damages. Unless Class-wide declaratory relief is issued, Defendants may continue to benefit from the violations alleged, and the members of the Class will continue to be unfairly treated. Prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, and adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications, making certification under Rule 23(b)(1)(A) and (B) appropriate.

## CAUSES OF ACTION

## COUNT I

### UNLAWFUL SURCHARGE – FAILURE TO MAKE AVAILABLE A REASONABLE ALTERNATIVE STANDARD

**(Violation of ERISA § 702, 29 U.S.C. § 1182(b) and PHSA § 2705, 42 U.S.C. § 300gg-4(j)(3)(B)–(E); 29 C.F.R. § 2590.702(f)(4)(i)–(v))**

79. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

80. ERISA prohibits group health plans from charging participants more for coverage based on a health-related factor. 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1). A tobacco surcharge is therefore unlawful unless the plan satisfies *each* condition of the narrow wellness-program exception. *Id.* §§ 1182(b)(2)(B), 300gg-4(b)(2)(B). To qualify for the wellness-program exception, the Plan must make available a reasonable alternative standard, make the *full* reward available to participants who satisfy it, and provide participants the opportunity to qualify for the reward at least once per year. 42 U.S.C. § 300gg-4(j)(3)(B)–(E); 29 C.F.R. § 2590.702(f)(4)(i)–(v).

81. Defendants fail each requirement. By imposing discriminatory surcharges of $15.00 per bi-weekly pay period on participants who use tobacco or e-cigarettes, without complying with the statutory and regulatory requirements governing outcome-based wellness programs, Defendants violate ERISA § 702(b), 29 U.S.C. § 1182(b)(1), and 29 C.F.R. § 2590.702(f)(4). Upon information and belief,

Defendants do not make available any wellness program to avoid the surcharge. There is no reasonable alternative standard that would allow a participant to obtain the full reward. Upon information and belief, no Plan material identifies a reasonable alternative standard. The Plan's lock-in provision (i.e., that Open Enrollment "is the only time that you can make changes to your benefits unless you have a qualifying life event during the year") confirms on the face of the materials that no in-year opportunity to obtain the full reward exists, and that the most a participant could ever obtain is a prospective adjustment beginning the following Plan Year. That is the very prorated, partial-reward structure Congress and the Departments forbade.

82. Further, Regions failed to include the required disclosures needed to qualify for the safe harbor. Regions' Enrollment Guide is a Plan material describing the terms of the wellness program—indeed, it is, by its own terms, a Summary of Material Modifications that "will govern" over the official plan documents. It describes the surcharge, the trigger, the amount, and the duration. It does not include any statement regarding the availability of a reasonable alternative standard, any contact information for obtaining the alternative, or the statement that the recommendations of a participant's personal physician will be accommodated. The omission of each element independently violates 29 C.F.R. § 2590.702(f)(4)(v) and 42 U.S.C. § 300gg-4(j)(3)(E). The Plan's SPD is also a Plan material describing the Plan's contribution structure, benefit terms, and premium differentials. ERISA § 102 and 29 C.F.R. § 2520.102-3 require the SPD to disclose, among other things, "[a] description or summary of the benefits" and "the circumstances which may result in . . . loss[] [or]

forfeiture" of those benefits. The Departments also made clear that information relating to premium differentials must be disclosed in the SPD. The SPD does not disclose any reasonable alternative standard, any contact for the alternative, the right to the full reward, or the physician-accommodation statement. Defendants therefore fail to satisfy the framework's notice requirements. *See* 29 C.F.R. § 2590.702(f)(4)(v); 42 U.S.C. § 300gg-4(j)(3)(E).

83. Because Defendants fail to satisfy these essential statutory and regulatory conditions, the wellness program safe harbor is unavailable, and the tobacco surcharge functions as a penalty rather than a compliant wellness incentive. Defendants' violations are facial and require no individualized inquiry: they are apparent from Defendants' own enrollment materials.

84. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action to: (A) enjoin any act or practice which violates any provision of Title I of ERISA or the terms of the plan, or (B) obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of Title I or the terms of the plan. *See* 29 U.S.C. § 1182(b). Because Defendants' surcharge program does not satisfy the criteria that plans ***must*** comply with to qualify as a compliant "program[] of health promotion and disease prevention," Defendants cannot qualify for the statutory safe harbor and the tobacco surcharge is, therefore, unlawful and discriminatory. Plaintiff and Class Members are entitled to relief under ERISA § 502(a)(3).

## COUNT II

## BREACH OF FIDUCIARY DUTY AND PROHIBITED TRANSACTIONS (PLAN-LEVEL RELIEF)

**(Violation of ERISA §§ 404, 406 and 409, 29 U.S.C. §§ 1104, 1106 and 1109)**

**(Brought Under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2))**

85. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

86. ERISA requires a fiduciary to act "solely in the interest of participants," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1), 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law" and require fiduciaries to act with "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271–72 & n.8 (2d Cir. 1982). At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The Plan's SPD identifies Regions as both the Plan Sponsor and the "Plan Administrator."

87. Outside of its role as Plan sponsor, Regions exercised fiduciary discretion in the administration of the Plan and its assets after the Plan was designed—in the collection, handling, and disposition of surcharge proceeds, which became Plan assets upon collection from participants (*see* 29 C.F.R. § 2510.3-102), and in the ongoing

monitoring (or failure to monitor) of the Plan's administration to ensure compliance with ERISA over multiple Plan Years.

88. Upon information and belief, Defendants used Plan assets (i.e., the surcharge proceeds withheld from participants' paychecks) to offset, dollar for dollar, Regions' own contribution obligations to the Plan, rather than depositing and retaining those Plan assets to fund benefits and accumulate reserves. Under the Plan's contribution hierarchy, participant contributions are applied first to pay self-funded benefits and Regions contributes only the remainder. Every dollar of tobacco surcharge therefore directly offset Regions' own contribution obligation. The cost savings inured to Regions, not to the Plan or its participants.

89. Defendants further breached the duty of loyalty by communicating to participants, in Plan materials they prepared and disseminated, descriptions of the tobacco surcharge that omitted material information ERISA required to be disclosed (i.e., the availability of a reasonable alternative standard, contact information, the physician-accommodation statement, and the right to the full reward). As fiduciaries, Defendants had a duty to communicate truthfully and completely about the Plan's terms. Their omissions deprived participants of the information necessary to avoid the surcharge—information that, had it been disclosed, would have directly reduced participants' cost-sharing and increased the funding flowing to the Plan from Regions. Year after year, Regions administered the Plan within the meaning of 29 U.S.C. § 1002(16) and was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21). Upon information and belief, the Committee participated in the effort to funnel

surcharge funds into the company's accounts while refusing to make available a compliant alternative standard.

90. Regions controlled and disseminated Plan communications, including the Enrollment Guide and the SPD, describing the premium differential but failed to include notice of a reasonable alternative standard. Regions also failed to conduct periodic, prudent reviews of the wellness program and related communications to ensure compliance with ERISA. Instead, it allowed a defective program that denied retroactive relief to persist year after year, despite its discriminatory effect and clear inconsistency with the full reward rule. Regions' failure is especially stark given that it reviewed and revised the Plan's terms annually—the 2025 Enrollment Guide catalogs changes to the Plan's wellbeing platform, dental waiting periods, life insurance evidence-of-insurability rules, and contribution rates—yet left the tobacco surcharge untouched and undisclosed. Ex. A at 2, 4.

91. Regions further breached its fiduciary duties by administering a Plan that did not conform with ERISA's anti-discrimination requirements. It acted disloyally by permitting surcharge funds to reduce Regions' own contribution obligations and by maintaining a program that withheld reimbursement from participants who ceased using tobacco or otherwise would have completed a reasonable alternative standard had one been offered. It also failed to notify participants in all Plan materials discussing the surcharge of the avenues by which to avoid the surcharge, as required by 29 C.F.R. § 2590.702(f)(4)(v). These omissions and misrepresentations are incompatible with ERISA's fiduciary mandates of loyalty, prudence, and adherence to governing law.

92. ERISA also imposes on appointing fiduciaries (i.e., Regions) the duty to monitor and supervise the actions of those administering the Plan. By allowing administrators and benefits staff to implement and maintain a non-compliant wellness program that violated ERISA's notice and full-reward requirements, Regions breached its duty to monitor. Regions failed to review the program's design, the disposition of surcharge proceeds, and the accuracy of participant communications, despite its obligation to ensure the Plan's ongoing compliance with federal law.

93. As a result of these breaches, Regions was unjustly enriched at the expense of the Plan and its participants. By deducting surcharges directly from associates' paychecks without administering a compliant wellness program or providing full-year reimbursement, Defendants secured financial savings for the employer while shifting costs to participants. The structure and administration of the program ensured that not all "similarly situated individuals" could receive the full reward, and participants were deprived of notice of any reasonable alternative standard. In effect, Defendants converted employee contributions (i.e., Plan assets) into a source of corporate savings, in violation of 29 U.S.C. § 1104(a)(1)(A).

94. By withholding unlawful surcharges and using those funds to offset Regions' financial obligations, Defendants caused the Plan to engage in transactions constituting a direct or indirect transfer of Plan assets to, or use of Plan assets for the benefit of, a party in interest—namely, Regions—in violation of 29 U.S.C. § 1106(a)(1)(D). Regions is a party in interest under 29 U.S.C. § 1002(14) because it is the employer of participants, the Plan sponsor, and a fiduciary exercising discretionary

authority over the Plan's administration and finances. Defendants also dealt with Plan assets in their own interest in violation of 29 U.S.C. § 1106(b)(1).

95. Defendants' conduct caused harm to the Plan. The Plan was deprived of assets that should have been deposited, retained, and used to fund benefits and accumulate reserves for participants. Instead, those assets were used to reduce Regions' own corporate contribution obligation. The Plan also suffered an opportunity-cost loss. Had Regions either refrained from collecting unlawful surcharge amounts or treated those amounts as supplemental Plan funding rather than as a substitute for its own contribution obligation, the Plan would have held more assets, accumulated greater reserves, and maintained a stronger funding base.

96. Regions also obtained wrongful profits from its use of Plan assets. The savings Regions achieved by offsetting its own contribution obligation were profits made through the use of Plan assets. Under ERISA § 409(a), Regions and other unknown John Doe plan fiduciaries are liable to "restore to such plan any profits of such fiduciary which have been made through use of assets of the plan." 29 U.S.C. § 1109(a).

97. As a direct and proximate result of these fiduciary breaches, Plaintiff seeks Plan-wide relief under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Defendants are liable to make good to the Plan all losses resulting from their breaches, restore all profits obtained through the use of Plan assets, disgorge the corporate savings Regions achieved by offsetting its own contribution obligations, and provide other appropriate equitable relief, including an accounting, constructive trust, equitable lien, and

removal or replacement of fiduciaries who breached their duties. *See* 29 U.S.C. § 1109(a).

## COUNT III

## BREACH OF FIDUCIARY DUTY (INDIVIDUAL RELIEF)

**(Violation of ERISA §§ 404 and 406, 29 U.S.C. §§ 1104 and 1106)**

98. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 78 above as if fully set forth herein.

99. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant to seek individualized equitable relief for a fiduciary's breach of duty. Defendants breached their fiduciary duties by collecting unlawful tobacco surcharges from participants, treating those amounts as Plan assets, and using them to reduce the company's own contribution obligations rather than administering them solely for the benefit of participants and beneficiaries. That same conduct also constituted prohibited transactions under 29 U.S.C. § 1106(a)(1)(D) and § 1106(b)(1), because Regions used Plan assets for its own benefit.

100. Plaintiff suffered individualized harm from Defendants' conduct. Plaintiff paid tobacco surcharges that should not have been imposed. Plaintiff was also deprived of the benefit of having those contributions deposited, retained, and used by the Plan to fund benefits and accumulate reserves solely in participants' interests. Because the Plan's funding structure ties participant contributions to the Plan's assets, reserves, and expected benefit obligations, Plaintiff also bore, and continues to bear,

higher contribution costs and increased risk of future cost increases or benefit reductions.

101. Plaintiff and the Class therefore seek individualized equitable relief under 29 U.S.C. § 1132(a)(3). That relief includes equitable restitution of unlawfully collected surcharge amounts traceable through Defendants' handling and commingling of Plan funds; disgorgement of profits and corporate savings Regions obtained through its use of Plan assets; an accounting of all surcharge amounts collected and used to offset Regions' contribution obligations; imposition of a constructive trust or equitable lien over funds wrongfully retained by Regions; and declaratory and injunctive relief prohibiting Regions from continuing to administer a noncompliant wellness program or using Plan assets to reduce its own contribution obligations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class representative for the Class, and appointing the undersigned to act as Class Counsel;

B. A declaratory judgment that the unlawful and discriminatory tobacco surcharges imposed on participants violate ERISA's anti-

discrimination provisions set forth in ERISA § 702, 29 U.S.C. § 1182;

C. An Order instructing Defendants to reimburse all persons who paid the unlawful and discriminatory surcharge;

D. A declaratory judgment that Defendants breached their fiduciary duties in violation of ERISA § 404, 29 U.S.C. § 1104, for, *inter alia*, instituting a surcharge on participants without offering a reasonable alternative standard in violation of ERISA's anti-discrimination provisions, for failing to notify participants of an alternative standard, and for failing to adequately monitor the terms of the Plan, the surcharge, and the wellness program, as well as communications with participants, to ensure they complied with ERISA and the applicable regulations;

E. An Order requiring Defendants to provide an accounting of all prior payments of the surcharges under the Plan;

F. Declaratory relief as necessary and appropriate, including an Order that Defendants' program was unlawful and that Defendants should not further violate the duties, responsibilities, and obligations imposed on them by ERISA with respect to the Plan, and ordering Defendants to remit all previously collected surcharges;

G. Disgorgement of any benefits or profits Defendants received or enjoyed due to the violations of ERISA § 702, 29 U.S.C. § 1182(b);

H. Restitution of all surcharge amounts Defendants collected;

I. Surcharge from Defendants totaling the amounts owed to participants and/or the amount of unjust enrichment obtained by Defendants as a result of their collection of the unlawful and discriminatory tobacco surcharges;

J. Relief to the Plan from Defendants for their violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; restoration of losses to the Plan and its participants caused by Defendants' fiduciary violations; disgorgement of any benefits and profits Defendants received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries; and all appropriate injunctive relief, such as an Order requiring Defendants to stop imposing the unlawful and discriminatory surcharges on participants in the future;

K. An award of pre-judgment interest on any amounts awarded to Plaintiff and the Class pursuant to law;

L. An award of Plaintiff's attorneys' fees, expenses, and/or taxable costs, as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and/or other applicable doctrine; and

M. Any other relief the Court determines is just and proper.

Dated: November 2, 2026,

Respectfully submitted,

*/s/ Mariya Weekes*
**MILBERG PLLC**
333 SE 2nd Ave, Suite 2000
Miami, FL 33131
Tel : (786) 206-9057
mweekes@milberg.com

Alexandr Rudenco *(pro hac vice forthcoming)*
**MILBERG PLLC**
800 South Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 263-8384
arudenco@milberg.com

*Attorneys for Plaintiff and the Proposed Class*